INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, et al., Plaintiffs,

v.

Richard A. LYNG, Secretary, U.S. Department of Agriculture, Defendant.

Civ. A. No. 84–3303.

United States District Court, District of Columbia.

Dec. 22, 1986.

Jordan Rossen, Gen. Counsel, Richard W. McHugh, Asst. Gen. Counsel, UAW Legal Dept., Detroit, Mich., Michael Holland, Gen. Counsel, Judith A. Scott, UMWA, Legal Dept., Wendy L. Kahn, Dwerdling, Schlossberg, Leibig & Kahn, Washington, D.C., for plaintiffs; Harold A. Katz and Ann C. Hodges, Katz, Friedman, Schur & Eagle, Chicago, Ill., of counsel.

Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., Lewis K. Wise and Thomas Miller, Attys., Civil Div., Dept. of Justice, Washington, D.C., for defendant; Roger Wiener, Office of

Gen. Counsel, Dept. of Agriculture, Washington, D.C., of counsel.

## MEMORANDUM AND ORDER CERTIFYING CLASS

OBERDORFER, District Judge.

On January 10, 1985, plaintiffs filed a motion for class certification pursuant to Fed.R.Civ.P. 23. Plaintiffs requested certification of a class consisting "of all UAW and Mine Worker strikers and their households who are or were otherwise eligible for Food Stamps but for the anti-striker provision of the Act, 7 U.S.C. § 2015(d)." Memorandum of Law in Support of Plaintiffs' Motion for Class Certification at 6 (filed January 10, 1985). Defendant consented to class certification but of a somewhat narrower class. The November 14, 1986 memorandum and order, 648 F.Supp. 1234, declared the striker provision unconstitutional, but did not rule upon plaintiffs' motion.

Plaintiffs have subsequently renewed their motion for class certification. In plaintiffs' present motion, they seek certification of a class consisting of

All UAW and UMWA strikers and their households (which, for purposes of this certification order only, includes strikers and their households in: UFCW Local 400, on strike against Marval Poultry; Steelworkers Local 3701 on strike against St. Josephs Resources; and Teamsters Local 912 on strike against Watsonville Canning) who:

1) will be, are, or have been otherwise eligible for Food Stamps but for the application of the striker disqualification of the Food Stamp Act (7 U.S.C. § 2015(d)(3)) and its implementing regulations, and

2) who have previously filed an application for Food Stamps, or were discouraged or prevented from filing an application by their state or local food stamp agency, or who will in the future apply for Food Stamps.

Brief in Support of Plaintiffs' Motion to Alter or Amend, Class Certification, and

Intervention at 11 (filed November 26, 1986).

Defendant still consents to class certification but poses three objections to the class as defined by plaintiffs.

First, defendant objects to the inclusion of non-UAW and non-UMWA strikers within the class, as envisioned in the first paragraph of plaintiffs' proposed class definition. Defendant also opposes plaintiffs' concurrent motion to intervene three individual named plaintiffs to represent these strikers and their households.

■ Plaintiffs' requests for intervention and expansion of the class both come after entry of final judgment in their favor. "[I]ntervention attempts after final judgments are 'ordinarily looked upon with a jaundiced eye.' Interventions after judgment have a strong tendency to prejudice existing parties to the litigation or to interfere substantially with the orderly process of the court." *United States v. U.S. Steel Corp.*, 548 F.2d 1232, 1235 (5th Cir.1977) (citation omitted). For this reason,

The general rule is that motions for intervention made *after* entry of final judgment will be granted only upon a strong showing of entitlement and of justification for failure to request intervention sooner.

*United States v. Associated Milk Producers, Inc.*, 534 F.2d 113 (8th Cir.), *cert. denied*, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976) (emphasis in original). Plaintiffs note that the proposed intervenors were affiants in the summary judgment stage of this litigation. Obviously, therefore, they were aware of the litigation. As no justification has been proferred for their failure to request intervention sooner, plaintiffs' motion for intervention and expansion of the class to include non-UAW and non-UMWA strikers should be, and will be, denied.

■ Defendant also argues that the class should be limited to persons "who were discouraged from filing an application by their local food stamp agency *because they were on strike,*" rather than for rea-

sons unrelated to the striker provision. In response, plaintiffs concede that there should be some relation between a person's status as a striker and the reason he was discouraged from applying for food stamps, but disagree that his status as a striker need be the only or the predominate reason for the discouragement. Instead, plaintiffs propose modifying the class to include persons "who were prevented or discouraged from filing an application ... due, *in part*, to their status as strikers or members of a striker's household...." The importance of this distinction is uncertain. The proof problems of establishing "discouragement" are already sufficient to preclude precision in the definition of the class. Nevertheless, a striker and his household should not be excluded from the plaintiff class merely because they were discouraged from applying for food stamps because of some factor in addition to the striker provision. Consequently, an accompanying order will certify a class to include persons "who were prevented or discouraged from filing an application ... due, in part, to their status as strikers or members of a striker's household...."

Finally, defendant argues that the class should include only those persons whose applications were denied or discouraged by operation of § 2015(d)(3) within one year prior to the filing of this suit. In support, defendant relies upon 7 U.S.C. § 2023(b), which states in pertinent part:

> In any judicial action arising under this chapter, any food stamp allotments found to have been wrongfully withheld shall be restored only for periods of not more than one year prior to the date of the commencement of such action....

By its terms, this section applies only to cases arising under the Food Stamp Act. As this case arises under the Constitution, section 2023(b)'s limitation on recovery does not apply.

For the foregoing reasons, it is this _____ day of December, 1986, hereby

ORDERED: that plaintiffs' motion for intervention should be, and hereby is, DENIED; and it is further

ORDERED: that plaintiffs' motion for class certification should be, and hereby is, GRANTED in part and DENIED in part; and it is further

ORDERED: that the plaintiff class should be, and hereby is, CERTIFIED and DEFINED to include

All UAW and UMWA strikers and their households who:

1) will be, are, or have been otherwise eligible for Food Stamps but for the application of the striker disqualification of the Food Stamp Act (7 U.S.C. § 2015(d)(3)) and its implementing regulations, and

2) who have previously filed an application for Food Stamps, or were discouraged or prevented from filing an application by their state or local food stamp agency due, in part, to their status as strikers or members of a striker's household, or who will in the future apply for Food Stamps.[*]

## MEMORANDUM RE RELIEF PENDING APPEAL

An order entered November 14, 1986, declared that defendant may not lawfully withhold food stamps from any individual plaintiff's household solely because the household includes a striker for the reason that 7 U.S.C. § 2015(d)(3), the striker amendment to the Food Stamp Act of 1977, 7 U.S.C. §§ 2011–2029, as administered, violates rights guaranteed to plaintiffs by the First and Fifth Amendments to the Constitution. The order withheld injunctive relief until the judgment becomes final. On November 26, 1986, plaintiffs moved to alter or amend the November 14, 1986 order and sought an injunction preventing defendant from enforcing the food stamp striker disqualification. Defendant opposes the motion and in the alternative

* Note that an Order Granting Interim Relief extends that interim relief to a class which is narrower than the class which would benefit from the order of November 14, 1986, should it be affirmed.

moves for a stay of any injunction pending appeal to the Supreme Court. On December 14, 1986, defendant noted such an appeal. Meanwhile, there are indications that the Supreme Court will not be able to hear this case until October 1987, or later.

The parties have further briefed and argued the issue of relief. Plaintiffs have filed a careful, albeit necessarily tentative, estimate of the number of plaintiffs' households likely to be eligible for food stamps during the pendency of the appeal. They estimate that the total cost of food stamps which would be issued pending appeal will range between $25,350 and $38,025 per month. Supplemental Memorandum in Support of Plaintiffs' Proposed Order on Interim Relief at 6 (filed December 16, 1986) (copy attached as Appendix A).

■ The defendant correctly points out the gravity of a judicial declaration that an Act of Congress violates the Constitution. However, he cites no authority for deferral of enforcement of such a declaration until its validity is finally determined by the Supreme Court. Although the November 14 declaration necessarily distinguished between the two relevant decisions of the Supreme Court, neither of which resolves the precise issue posed here, *compare Lyng v. Castillo,* —— U.S. ——, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986) *with United States Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), the parties have not demonstrated any reason to retract or to modify the declaration. At the trial level, plaintiffs are more than likely to prevail on the merits; they have prevailed. Without purporting to predict the Supreme Court's decision on the merits, the Court is persuaded that, in all of the circumstances here, correct discharge of its constitutional responsibilities requires prospective application of the law as it has been declared, with relief limited to the prevailing class of plaintiffs. *See, e.g., Graves v. Barnes,* 405 U.S. 1201, 1203, 92 S.Ct. 752, 753, 30 L.Ed.2d 769 (1972) (Powell, J., as Circuit Justice); *Virginia Petroleum Jobbers Ass'n v. Federal Power Commission,* 259 F.2d 921, 925 (D.C.Cir.1958). It is noteworthy that the same district court order that declared the statute at issue in *Moreno* to be unconstitutional enjoined defendants from denying food stamp eligibility to the plaintiffs and apparently required no bond pending appeal. *Moreno v. United States Department of Agriculture,* 345 F.Supp. 310, 316 (D.D.C.1972) (three judge court), *aff'd,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). The risk of reversal in this case can be recognized by requiring a bond which would enable plaintiffs to reimburse defendant for food stamp payments made pending appeal.

The hardship inherent in the denial of food stamps to any household or person lawfully entitled to them is manifest and well documented in the original record and the supplemental record developed since November 14 with respect to injunctive relief. *See Haskins v. Stanton,* 794 F.2d 1273, 1276–77 (7th Cir.1986); *Coalition for Basic Human Needs v. King,* 654 F.2d 838, 840–41 (1st Cir.1981). But for the striker disqualification, the individual plaintiffs who would benefit from interim relief are eligible for food stamps and are by definition living at or near the poverty level, unable to provide an adequate diet for themselves and their families. *See* Plaintiffs' Reply Brief in Support of Motion to Alter or Amend and Attachments 2 through 9. Continued enforcement of the striker disqualification would penalize and inhibit plaintiffs' exercise of their rights to associate and to express themselves (*see* Memorandum filed November 14, 1986 at 5, 7, 11–16), and inflict the consequential, quantifiable harm of denying them "food on the table." *Compare Memphis Community School District v. Stachura,* —— U.S. ——, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). Such proof of irreparable harm overcomes defendant's application for a stay, in the absence of strong proof of an inequitable burden upon defendant.

The administrative burden on defendant of providing payments for food stamps for approximately 600 strikers pending appeal is not materially greater than what is re-

quired of him in administering the food stamp program for the benefit of the millions of households already participating.[1] The plaintiffs have assumed responsibility for appropriate notice to potentially eligible households. The potential administrative burden is further contained by the decisions to limit relief to the plaintiff class and not to permit intervention pending appeal. Memorandum and Order Certifying Class (filed December 22, 1986). There is a clear public interest in enforcement of First and Fifth Amendment rights put in jeopardy by the striker disqualification. The risk of loss should defendant prevail on appeal will be minimized by the bond requirement, presently $400,000, and provision for adjustment of it should it prove to be inadequate. To assure minimal administrative complications, the Court invited the parties to settle on an order in a way that would to the fullest extent possible anticipate and avoid administrative complications.[2] The accompanying order is that proposed by defendant (without waiving his opposition to the decision on the merits or to relief at this time) except for the bond requirement.

Defendant proposed a $300,000 bond, with provision for automatic increases should the food stamp payments for strikers reach 90 percent of the bond. Plaintiffs proposed that the union plaintiffs post a $400,000 bond with provision for *ad hoc* adjustments on motion of either party. The plaintiffs' proposal also contemplates that the union plaintiffs will hold the individual plaintiffs harmless from any reimbursement obligation, should the Supreme Court reverse. The plaintiffs' proposals on these aspects have merit.

At a hearing on the proposed orders, counsel for the parties advised that there would be monthly reports of the actual payment experience. These should provide ample warning of any departure from the estimate which might require modification of the bond, or a cessation of payments if plaintiffs cannot commit to maintaining adequate security. Accordingly, the accompanying order will require defendant to commence payments for food stamps for eligible plaintiffs and class members who apply as soon after January 2, 1987, as is practicable. The order adopts the plaintiffs' proposal for a $400,000 bond pending appeal, but affords a hearing before any bond adjustment is required and encourages voluntary adjustment. There is no provision for retroactive relief pending appeal.

## ORDER GRANTING INTERIM RELIEF

Upon motion of the plaintiffs' pursuant to Rule 59(e) and the defendant's response thereto, and for reasons stated in the accompanying Memorandum Re Relief Pending Appeal, it is this 22d day of December, 1986, hereby

ORDERED: that, for the purpose of effectuating relief pending appeal, a class (narrower than that certified in a Memorandum and Order Certifying Class, filed this date) is certified and defined as follows:

All UAW and UMWA-represented strikers and their households who are otherwise eligible for Food Stamps but for the application of the striker disqualification of the Food Stamp Act (7 U.S.C. § 2015(d)(3)) and its implementing regulations and who file applications for Food Stamps as provided in this Order.

And it is further

ORDERED: that the defendant Secretary of Agriculture is enjoined, pending further orders of this Court or the Supreme Court, from enforcing the provisions of 7 U.S.C. § 2015(d)(3) and its implement-

---

1. The Court considered an interim order which would provide food stamps for the households of eligible strikers, but would reduce each allotment to exclude the striker. *See* Memorandum of November 14, 1986 at 15–17. The defendant indicated that such a requirement might complicate interim administration. The principle will be reconsidered in the settling of a final order at such time as the November 14 declaration may become final.

2. Counsel have alluded to several agreements between the parties which are not incorporated in the order, but designed to facilitate administration of it, e.g. the provision for monthly reports of actual and anticipated disbursements.

ing regulations to disqualify class members from participation in the Food Stamp program when they are determined by a state or local Food Stamp agency to meet the other eligibility requirements of the Food Stamp Act, 7 U.S.C. § 2011 *et seq.,* and its implementing regulations; and it is further

ORDERED: that the retroactive payment of Food Stamps to class members prior to the date on which applications are first taken pursuant to this Order is stayed pending the outcome of the defendant's appeal and further orders of this Court; and it is further

ORDERED: that the defendant Secretary will notify the appropriate state Food Stamp agencies as soon as practicable that they and their subordinate local agencies are required to accept and process the applications of the members of the plaintiff class and promptly to determine their eligibility for Food Stamps beginning with the date of their application (but in no event, prior to January 2, 1987) and for each subsequent month for which their respective applications for Food Stamps are filed; and it is further

ORDERED: that the defendant Secretary will reimburse state and local Food Stamp agencies for the administrative costs associated with these payments as provided by 7 U.S.C. § 2025. Such reimbursements shall be handled in the same fashion as they are normally handled under the Food Stamp Act and its implementing regulations; and it is further

ORDERED: that the defendant Secretary will, at the earliest practicable date, publish appropriate notice in the Federal Register for, among others, the relevant federal, state, and local Food Stamp agencies, including in that notice a copy of this Order; and it is further

ORDERED: that the plaintiff unions shall, within seven (7) business days of the date of this Order, furnish surety or corporate bonds totalling $400,000, which bond the Court finds to be a sufficient amount at this time to protect the defendant's costs of Food Stamps (other than administrative costs) incurred pursuant to this Order and

subject to future adjustments in an amount as agreed to by the parties or order ed by this Court. Such bond shall be due and payable to the defendant in the event that this Court's Order of November 14, 1986 is reversed on appeal, and defendant's sole recourse for satisfaction of any additional costs of Food Stamps paid under this Order shall be against the plaintiff unions without recourse to recoupment for collection action directed to individual class members; and it is further

ORDERED: that the parties will work to resolve all questions of compliance with this Order in good faith and will not resort to formal enforcement proceedings in this Court without first providing twenty-one (21) days written notice of the specific compliance problem to the opposing party; and it is further

ORDERED: that the defendant Secretary will give twenty-one (21) days written notice to the plaintiffs of any intent to adjust the amount of bond, before moving this Court for any such adjustment.

## APPENDIX A

### SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFFS' PROPOSED ORDER ON INTERIM RELIEF

Plaintiffs have proposed that the bond in this matter initially be set at $400,000, with the possibility of subsequent adjustment, upon either agreement between the parties or defendant's application to the Court. The bond is intended to protect the defendant's costs of food stamps under this Order. As clarified at the hearing on December 18, 1986, the "costs of food stamps" means the value of the food stamps issued pursuant to this Order and does not include any additional administrative costs. Under 7 U.S.C. § 2025, the Food Stamp Act provision providing for administrative costs, any extra administrative costs—if any—under this Order would not be distinguishable from other administrative costs. Since plaintiffs—not defendant—will provide notice to class members of this Order, and

since it is estimated that relatively few households per month (i.e., perhaps 500 nationwide) might be eligible for food stamps under this Order, any administrative costs associated with this appeal—even if they could be segregated—are clearly *de minimus*.[1]

The basis for plaintiffs' belief that $400,000 bond is sufficient at this time is the following:

(A) Estimate of number of UAW and UMWA-represented individuals on strike (not including individuals who are locked out or permanently replaced and therefore not presently affected by the striker disqualification, 7 U.S.C. § 2015(d)(3)):

7570 people.[2]

(B) Estimate of number of strikers who might be eligible for food stamps.

6.7% of 7570 = 507[3]

(C) Estimate of monthly food stamp allotment to strikers' households who are eligible for food stamps.

$50–$75

Under current food stamp policy, a household is not eligible for food stamps at all if its allowable resources (both liquid and non-liquid) exceed $2,000.[4] 7 CFR 273.-8; 51 Fed.Reg. 11009, April 1, 1986. In addition, a household whose income exceeds certain specified income levels (either 100% or 130% of poverty level) will not be eligible for food stamps. 7 CFR 273.9; 51 Fed.Reg. 19880 (June 3, 1986). Furthermore, assuming a household meets these asset and income eligibility standards, 30% of non-exempt household income (after specified deductions) is subtracted from the maximum food stamp allotment, thereby reducing the amount of the household's food stamp allotment. 7 CFR 273.9; 7

1. This conclusion is further buttressed by the fact that USDA's regulations require that food stamp agencies accept and process applications from applicants notwithstanding their apparent ineligibility. See 7 CFR 273.2(C)(1) and (C)(2)(i). Thus, even if this injunction were not to issue, the food stamp agencies are already legally obliged to process applications from strikers. Assuming, *arguendo*, that these regulations are being followed, the requested injunction should not generate any additional administrative burdens for taking and processing applications.

2. This figure is derived by taking the average number of strikers receiving strike fund benefits in each union over a recent period and subtracting out the number of those individuals who are locked out or permanently replaced:

UAW: 7960 ' 1000 (est.) = 6960

UMWA: 1420–810        = 610
                              ———
                              7570

Source: December 1986 Affidavit of Percy Baxter, ¶ 3, Att. 11a to Pltfs' Reply Brief in Support of Motion to Alter or Amend (hereafter Plaintiffs' Reply); December 15, 1986 Statement of Ralph Edward Bowling, Att. 11b to Pltfs' Reply Brief. See also December 19, 1986 Affidavit of Percy Baxter, attached hereto. As Mr. Baxter's Affidavit indicates, the estimate of 1000 (12.5% of 7960) as the proportion of UAW strikers locked out or permanently replaced is *very conservative*. Currently 62.6% of the 11429 John Deere strikers are locked out, while 25.8% of the 2457 non-Deere strikers are locked out. If we applied the lower 25.8% lockout figure to the 7960 average, the 6960 figure used in the esti-

mate would be too high by more than 1000 people (i.e., 7960 minus 25.8% = 5906).

3. The 6.7% figure is derived from the March 26, 1981 GAO Report CED 81–85, "Information on Strikers' Participation in the Food Stamp Program." Att. 1 to Plaintiffs' Reply. Based on surveys by the Department of Agriculture's Food and Nutrition Service (FNS), which administers the Food Stamp Program, GAO reported the following percent of strikers participating in the food stamp program:

| Sept. 1976 | 3.6% |
| February 1978 | 36.4% |
| November 1978 | 8.8% |
| April 1979 | 3.6% |
| November 1979 | 10.8% |

As explained throughout the GAO Report (pp. 3, 4, 5, 6), because of the existence of a coal miner's strike in the February 1978 survey figures, the GAO did not include the February 1978 figures in any of its projections.

For that reason, and perhaps more importantly, because subsequent to February 1978 the UMWA instituted a selective strike fund providing $200 weekly benefits to striking minors (see Answers of UMWA to Defendant's First Set of Interrogatories, ¶ 17–18), we excluded the February 1978 figures and calculated the average percentage of strikers participating in the food stamp program in the FNS' four remaining survey months. Thus, 3.6 + 8.8 + 3.6 + 10.8 ÷ 4 = 6.7%.

4. Except in households including one or more members over 60, the resources may not exceed $3,000.

C.F.R., 273.10; 51 Fed.Reg. 36043 (Oct. 8, 1986).

The current *maximum* allotments of food stamps are:

| Household Size | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Each Addt'l. Person |
|---|---|---|---|---|---|---|---|---|---|
| Maximum Monthly Allotment | $81 | $149 | $214 | $271 | $322 | $387 | $428 | $489 | $61 |

51 Fed.Reg. 36043 (Oct. 8, 1986).

Applying these basic principles to the case at bar, assuming a UAW or UMWA striker household's assets became low enough to make the household eligible and assuming the household had no non-exempt income except strike fund benefits: hypothetical 1, 2, or 3–person mineworker households receiving $200 weekly strike benefits would not be eligible for any food stamps, while a four-person mineworker household would be eligible for $58/month of stamps, a five-person household would be eligible for $109/month of stamps.[5] A hypothetical one-person UAW striker household receiving $100/week of strike benefits would not be eligible for food stamps, while a two-person household would be eligible for $65/month; a three-person household for $130/month; a four-

person household for $187/month; and a five person household for $238/month.[6]

To the extent that the household had *any* non-exempt income other than strike benefits (see 7 CFR 273.9(b)), the household would receive even fewer food stamps than described above.[7]

Based on the assumption of 507 average striker households eligible for food stamps, as computed above (p. 3), the total cost of food stamps under the proposed Order might range between $25,350 per month (or $304,200 per year)[8] assuming a $50 monthly food stamp allotment and $38,025 per month (or $456,400 per year)[9] assuming a $75 monthly allotment. The proposed $400,000 bond is closer to the top of that range, and would be enough, even if the

5. Under 7 CFR 273.10(c)(2)(i), weekly non-exempt income is multiplied by 4.3 to determine monthly non-exempt income. Statutory deductions are then subtracted from monthly non-exempt income, 7 CFR 273.9; 51 Fed.Reg. 36043 (Oct. 8, 1986). 30% of the remainder is subtracted from the maximum monthly food stamp allotment for the household size to determine the household's food stamp allotment. Applying these rules to a hypothetical mineworker household—assuming the household was entitled to a $50 excess shelter deduction, (7 CFR 273.9(d)(5); 51 Fed.Reg. 36043 (Oct. 8, 1983), gives the following results:

Non-exempt income: $200 weekly
× 4.3 = $860 monthly
Subtract standard deduction – 99
761
Subtract excess shelter deduction – 50
711 × 30% = 213.30
[Amount to be subtracted from maximum monthly allotment]

6. Applying the rules described above,

Non-exempt income: = $100/week
× 4.3 = $430/month
Subtract standard deduction = – 99
331
Subtract excess shelter deduction = – 50
281 × 30% = $84.30
[Amount to be subtracted from maximum monthly allotment]

7. Furthermore, if the households were not entitled to an excess shelter deduction as the examples assume, the households would also receive fewer food stamps.

8. $507 \times 50 = 25,350 \times 12 = 304,200$

9. $507 \times 75 = 38,025 \times 12 = 456,300$

$75 monthly allotment is used, to last nearly one year.

Obviously, the calculation of the food stamp cost under the Order is speculative. Plaintiffs believe, however, that the estimates are reasonable and, if anything, over-estimate likely costs. While the average number of UAW and UMWA non-locked out and non-permanently replaced strikers will vary and cannot be predicted with precision, the timing of the major UAW and UMWA contracts is such that no major strikes should occur in either union before this case would be decided on appeal. The UAW-Chrysler contract does not expire until September 1988 and the national bituminous-coal-UMWA contract runs through January 1988. December 15, 1986 Statement of Ralph Edward Bolling, ¶ 7, Att. 11b to Plaintiffs' Reply. The General Motors and Ford UAW contracts do not expire until September 14, 1987. Even if a UAW strike should occur after September 14, 1987, given the low asset and income levels prerequisite to food stamp eligibility, it is highly unlikely that a typical GM or Ford worker would be immediately eligible for Food Stamps. Furthermore, as described *supra*, p. 861, n. 2, it is very likely that the figures we have used on the likely number of non-locked out strikers is higher than is likely to occur. Obviously, if the number of striker households eligible for food stamps is lower than our estimates, the costs of food stamps under this Order will be lower than the $25,000–$38,000 monthly estimates predicted.

For the reasons described above, plaintiffs believe that a bond of $400,000 is not only substantial, but is a good faith estimate of the amount necessary to cover the value of food stamps issued under the proposed Order. If experience proves that the amount is insufficient, the proposed Order provides for the possibility of adjustment either by agreement of the parties or by Order of this Court.

Respectfully submitted,
JORDAN ROSSEN, GENERAL COUNSEL
RICHARD MCHUGH, ASSISTANT GENERAL COUNSEL
International Union, UAW

MICHAEL HOLLAND, GENERAL COUNSEL
JUDITH SCOTT, ESQ.
United Mine Workers of America
WENDY L. KAHN, ESQ.
Zwerdling, Paul, Leibig, Kahn & Thompson
By: /s/ Wendy L. Kahn
WENDY L. KAHN

APPENDIX B

SUPPLEMENTAL AFFIDAVIT OF
PERCY BAXTER

STATE OF MICHIGAN
COUNTY OF WAYNE

Percy Baxter, being first duly sworn, states his affidavit as follows:

1. This affidavit supplements his earlier affidavit (Plaintiffs' Exhibit 11a, attached to Plaintiffs' Reply Brief (filed December 15, 1986)) concerning the average monthly number of UAW strikers from October 1985 until September 1986.

2. The UAW Strike Insurance Program does not distinguish between individuals who are on strike or involved in a lockout in making strike benefit payments. The figures provided in my earlier affidavit are an accurate reflection of the number of individuals receiving strike benefits who were involved in either strikes or lockouts. However, in addition to these total figures, the Department's records do indicate locals involved in a lockout. A review of the Department's records for the period of October 1985 until September 1986 discloses that five lockouts involving 1557 members occurred during this period.

3. Our records do not indicate which strikes are those in which the employer has hired permanent replacements for strikers.

4. A review of the Department's "Current Strikes" report dated December 15, 1980, reveals the following information:

| | |
|---|---|
| Total UAW Recipients of Strike Benefits | 13,886 |

Less Total John Deere Recipients Locked Out (of 11,429 Total Deere Recipients) 7,150
Less Other Recipients Locked Out 633
Total UAW Strikers as of December 15, 1986 6,103
Further affiant sayeth not.

/s/ Percy Baxter
Percy Baxter

Subscribed and sworn to before me this 19th day of December, 1986.

/s/ Karen V. Harmon
Notary Public